Plaintiff, a co-partnership, engaged in the general practice of law in the City of Shreveport, Louisiana, seeks to recover primarily of the defendant, a real estate broker of said city, the sum of Five Hundred ($500) Dollars, allegedly due for services rendered to him under contract in connection with the purchase of valuable lands, north of said city, from the Lear heirs.
The cause of action alleged and relied upon to recover, is reflected from article 4 of the original petition and article 5 of the supplemental petition. They read as follows:
"That the defendant, Tony S. Neal, is a real estate broker doing business in Shreveport, Louisiana, and during or about the month of February, 1946, called at the office of petitioner and discussed with one of petitioner's partners, Robert G. Chandler, the question of acquiring the above described property from the owners thereof, verbally agreeing that if petitioner secured from the owners an offer to sell said property to defendant Neal at a price he was willing to pay and would handle the negotiations incident to such transaction, the preparation and placing in escrow of contracts, etc., that he (the said Tony S. Neal) would pay petitioner the sum of $500."
"That petitioner accepted said employment and entered upon negotiations with the owners of the said property, which negotiations lasted from February, 1946, to October 5, 1946, at which time an agreement to sell by the Lears and to buy by the Great National Development Company, Inc., the designee of Tony S. Neal, was duly executed and placed in escrow in the Commercial National Bank in Shreveport."
Plaintiff also alleged that at the time it was employed by said Neal to perform the services described in its petition, it was not aware that he was acting other than in an individual capacity, but subsequent thereto and at the time certain contracts of sale of the property were prepared, petitioner was instructed by him to incorporate therein the name of the Great National Development Company, Inc., as purchaser, which was done; that therefore, having failed to disclose the name of his principal in dealing with plaintiff, he is personally liable for payment of the fee agreed upon. Neal is president of said corporation which also was made defendant herein, against whom and Neal in solido, in the alternative, judgment is prayed.
For want of information the company denied each and every allegation of the original and supplemental petitions excepting those relating to the residence and membership of plaintiff partnership and the residence and profession of the defendant, Neal.
Defendant Neal denies liability to plaintiff for payment of the fee for which sued. He admits that in the month of February, 1946, he did contact Robert G. Chandler, member of plaintiff firm, for the purpose of enlisting his assistance in buying the land in question because he thought he was the attorney for the Lear heirs and would have influence with them; that he was contacted merely for the purpose of transmitting to said heirs defendant's offer of $85,000 to purchase the land; that nothing was promised said Chandler or intended to be paid by this defendant to him for such services; that the offer to purchase at this price was unsuccessful.
Neal further avers that subsequent to the above enumerated events his principal authorized him to pay the sum of $100,000 for the land and that efforts to purchase same at this price, through persons other than said Chandler, were made, but without *Page 437 
success; that at this juncture he approached said Chandler and told him that if he could persuade his clients (the Lears) to take $99,500 for the land, defendant would see that his principal paid him $500 for such services; that all efforts of Chandler to induce the Lear heirs to accept said price were abortive and, therefore, no fee was earned by or is due to him in that connection.
The lower court rejected plaintiff's demand as against the corporation but awarded it judgment against Neal for the amount for which it sued, and he prosecutes this appeal therefrom.
Plaintiff's position is that through Mr. Chandler it induced the Lears to fix a price and terms at which they were willing to sell and which were acceptable to defendant and at which he for his company and designee bought the property.
Defendant's position is that when the Lears rejected the offer of $99,500, his obligation to pay plaintiff the $500 fell with it.
As to the first alleged agreement, defendant contends that there was no binding contract between him and plaintiff, represented by Chandler, as there was no meeting of the minds since he did not intend to, nor did he in fact, agree to pay for the service Chandler promised to render, whereas, Chandler was of the belief that defendant did commit himself to pay for such services.
Unfortunately both sides rely mainly upon testimonial proof to sustain their respective contentions. If Mr. Chandler's recollection of the substance of the first agreement between him and Mr. Neal is correct, then it would follow that Mr. Neal's memory on the same subject is very defective because it is not intimated or suggested by any one connected with this suit that he would wilfully misrepresent the facts for gain. If Mr. Neal's recollection of what transpired between him and Mr. Chandler at this first conference is correct, then the inference arises that Mr. Chandler, intentionally or unintentionally, is prosecuting this suit to enrich himself to the extent of a relatively small amount at Mr. Neal's expense. No one has intimated or suggested that Mr. Chandler would be guilty of intentionally doing such a thing. Generally, a man is more likely to forget something that did happen than he is to imagine or come to the conclusion that something happened, which, in fact, did not happen.
Mr. Neal and his company owned some acreage adjacent to that of the Lear heirs. The Lear land consists of 113 acres and is about three miles north of the City of Shreveport. It is traversed by the four-lane concrete highway No. 8, that leads northerly out of the city, and by another highway that runs easterly and westerly. Both tracts are comprehended within a project of development designed to attract persons desiring to erect expensive homes on large lots beyond the city limits.
There are eight of the Lear heirs who were interested in said lands as owners, including the mother of the children, but when events herein related transpired, only one of the heirs, Craig Lear, lived on the property. He operated a small mercantile business and had a residence on a small portion of the land owned by him individually. His brother, Earnest, individually owned a small portion of the tract that was improved. These individual ownerships added to the difficulty of fixing a price on the entire property. The mother and all heirs, save Craig and one who lived in Portland, Oregon, were residents of Los Angeles, California.
This property, for the reasons above mentioned, and others, due to economic conditions, during and following the recent world war, was much sought after by persons financially able to promote its development for residential purposes. Mr. Neal had for several years sought, through Craig Lear, to have the owners fix a price at which they would sell, but was uniformly unsuccessful. Craig Lear would transmit to his co-heirs offers to purchase but they invariably refused to fix a price.
In February, 1946, Mr. Neal's desire to acquire the property was very much quickened. He was informed by a mutual friend that Mr. Chandler was the attorney for some or all of the Lears and he immediately contacted him in the hope that *Page 438 
through his influence the owners could be induced to fix a price at which they would sell.
Mr. Neal's information that Mr. Chandler represented, as attorney, some or all of the Lear heirs was not true. He had in the past represented Craig Lear and possibly one of his brothers in some business transactions, but had never represented these two or the other heirs, generally. He did not know the names nor the whereabouts of any of the heirs save Craig. None of them had authorized or requested him to try to find a purchaser for their property.
Mr. Neal testified that in the conversation with Mr. Chandler in February, 1946, he was informed by him that he did represent all of the Lear heirs. Mr. Chandler denies this emphatically. But, Mr. Chandler did agree with Mr. Neal to make immediate efforts to induce the Lear heirs to fix a price at which they would sell the property. Naturally, he first got in touch with Craig with the view of interesting him in Mr. Neal's proposition and through him to interest his co-owners. He at no time suggested to Craig that the property be sold for the price offered, but did advise him that the time was favorable for selling; perhaps, better than would be thereafter.
On February 13, 1946, after the first conversation between Neal and Chandler on this subject, Mr. Neal wrote a letter to Mr. Chandler in which he stated his willingness to pay $85,000 for the entire property and outlined in a general way other terms on which he would purchase. Nothing is said in this letter concerning compensation for Mr. Chandler's services. The Lears are referred to therein as his clients.
The day following receipt of this letter, Mr. Chandler wrote Craig Lear and in the letter he copied in full the proposition to purchase as it appeared in Mr. Neal's letter to him. Concluding his letter, Mr. Chandler said:
"In view of the fact that I have been requested to advise all the parties in interest of this offer I shall appreciate it if you will furnish me their names and addresses in order that I may forward them copies of this letter. Following receipt of this letter by the parties I shall appreciate it if you will confer on the matter and advise me your decision."
Complying with this request, Craig furnished Mr. Chandler with the names and addresses of all of the absent heirs. Mr. Chandler wrote one of them as follows:
"Enclosed herewith is a letter we wrote Craig the other day containing an offer to purchase the property in which you are interested, situated just north of Shreveport.
"I would like you and your co-owners to discuss this matter and let me know whether or not you are interested in accepting the offer made."
None of the heirs replied to this letter, and on March 25th plaintiff wrote Henry J. Lear as follows:
"Mr. Neal would like to hear from you and your co-owners with reference to the offer made by him at the time you were in Shreveport. As you know, he has certain other property North of your property and desires to proceed with its development. He cannot proceed until matters are definitely settled with you.
"He has requested me to ask for a reply to this offer within ten (10) days because if it is not accepted he wants to forget the matter and proceed to develop the property he already owns. I shall appreciate it if you will reply to this letter either by air mail or by telegram."
This letter, so far as the record shows, was also ignored. Craig finally informed Mr. Chandler that the proposition was not acceptable and it was declined. Thereafter, the date not being fixed in the record, Mr. Neal's financial backers authorized him to offer $100,000 for the property. He immediately communicated this action to Mr. Chandler saying to him, according to Chandler, that if the property could be bought for $99,500 the remaining $500 would pay the fee due him. However, Mr. Neal says that he told Mr. Chandler that if this property could be purchased for $99,500 he would pay him the $500 for his efforts toward that end. *Page 439 
About the time of making the above mentioned offer, the idea was conceived by someone to send Craig Lear to California to lay same before the other heirs for their consideration. Mr. Neal asked Mr. Chandler to suggest to Craig that he make the trip and agreed to pay his expenses there and back. After several days absence, Craig returned and informed Mr. Chandler and others that the offer was refused but submitted a counter proposition to sell for $105,000. He was accompanied back home by his brother, Earnest G. Lear. This offer was eventually accepted by Mr. Neal, but there were certain covenants that the heirs wished to be incorporated in the act of sale that had not been agreed to by Mr. Neal. On May 20, 1946, Craig and Earnest Lear addressed a letter to Mr. Neal in which they named three stipulations they insisted must go in the deed before it would be signed by them. Craig Lear then held powers of attorney from all of the other heirs and was acting for them, although Earnest G. Lear signed this letter personally. The letter was transmitted by Mr. Chandler to Mr. Neal with a brief note of his own that read as follows:
"Enclosed is a letter stating what Craig and Earnest want.This was the best I could do. They say the California people insisted on increasing their part from $75,000 to $80,500.
"Please let me know what you want to do."
The preliminary agreement, looking to the act of sale, contained the changes outlined in the above mentioned letter. The letter was prepared by Mr. Chandler after the two Lears had counseled with him. Obviously, it and the note served to bring the parties finally together on terms agreeable to all concerned. And, equally true it is that Mr. Chandler played an important part in attaining this long sought for result.
The record unquestionably discloses that from the time of first discussion of the purchase of the Lear lands by Chandler and Neal, the former strived assiduously to have the heirs fix a price on the property. He kept in touch with them all along through Craig, and prepared several documents for their signatures.
It is made evident that Craig Lear had the utmost confidence in the word of Mr. Chandler and invariably sought and followed his advice, suggestions, etc., during the many months the negotiations were in progress. It would not do violence to the established facts of the case to conclude that Mr. Chandler's advice to the effect that then was a very good time to sell and that a better price could then be gotten than would likely be obtainable afterwards, had some influence upon Craig's decision to sell. It appears that he held the key position.
Just prior to the delivery to a bank in Shreveport, in escrow, of the agreement between the parties, Mr. Chandler informed Mr. Neal that the $500 due him should then be paid. Mr. Neal denied liability for the amount, stating that when the $99,500 offer was refused, his liability for payment of the $500 terminated. Mr. Neal then went to see Craig Lear and after explaining to him that Mr. Chandler was demanding that he (Neal) pay him $500 for his services in connection with the sale, asked Lear if he would not pay the same. He suggested to Craig that he see Mr. Chandler and talk with him about the matter. He did so very soon thereafter and expressed a willingness to pay the amount, but attached some conditions to the offer. Mr. Chandler positively refused to accept any payment from Craig for the services rendered by him and stated that Craig had not employed him, did not owe him one penny, and that he would not accept his money at all; that before he would do so, he would lose the whole amount.
It is quite certain that all along Mr. Chandler considered he was serving Mr. Neal. His actions prove it beyond any doubt. He agreed only to endeavor to induce the Lear heirs to fix a price on the lands that would be acceptable to Mr. Neal. Had he then represented the heirs, as contended, it would have been ethically questionable to have accepted employment from Mr. Neal also. Mr. Neal was the one most interested in having the price fixed. *Page 440 
It is certain that in each instance when the heirs rejected an offer made to them, Mr. Chandler thereafter continued his efforts to accomplish that which Mr. Neal asked of him. Convincing proof that Mr. Chandler was certain he was promised payment of $500 in the first conference between him and Mr. Neal is to be found in the fact that after the $99,500 offer was refused he continued his efforts in Mr. Neal's behalf.
A strong circumstance that supports Mr. Chandler's contention lies in the fact that Mr. Neal admits he agreed to pay him $500 if the sale was closed for $99,500, and by the same token would he not have been willing to pay the same amount if the sale had been closed for the first offer, or $85,000, a much smaller price?
While the offer of $99,500 was pending, Mr. Neal agreed with Mr. H.E. Harper, a neighbor of Craig's, that he would pay him $500 if he could procure acceptance of the offer by the Lears. He endeavored to do so but failed. This is pointed to as a strong circumstance in refutation of Chandler's position that he, from the beginning, was promised a fee of $500, by Neal. And, it is argued that surely Neal would not at the same time have outstanding two commitments of the same character. But, Neal admits that he promised both Harper and Chandler, respectively, to pay $500 to the one who succeeded in inducing the Lears to accept the offer. At no time was Neal exposed to double liability for payment of the amount, and this is true even should we take into account the original agreement, according to Chandler, to pay him $500 for the service he agreed to render. It was a case of who could first procure for Mr. Neal that which he desired.
The fact that in his letter to Mr. Chandler of date February 13th, Neal did not refer to the matter of compensation to be paid Chandler for his services, is not, in our opinion, significant. We know that as between attorney and client when the fee is once fixed, it is rarely ever referred to thereafter until it becomes due.
The parties to this litigation enjoy excellent reputations for probity and fair dealing in their respective fields of activity. The veracity of each is on the same footing before the court. Because of these facts, appellant argues that the case is not made out in appellee's favor, and, as this burden rested upon it, there should be judgment rejecting plaintiff's demands.
Mr. Chandler doubtless is a careful lawyer and possesses business ability. Naturally, he does not render service without knowing who will compensate him therefor. Had the fee in this case not been originally fixed it is very likely his firm would doubtless have sued on quantum meruit for an amount much in excess of $500.
The circumstances of the case strongly support plaintiff's contentions; in fact, they are of sufficient weight to unbalance the scales in its favor. We are disposed to conclude and do conclude that because of the many conferences, discussions, decisions, etc., made by Mr. Neal over the several months the purchase of these valuable lands was pending, he simply forgot his original agreement with Mr. Chandler.
The learned trial judge, seasoned by many years experience in solving controversies between men, resolved the factual issue against the defendant. Surely there appears no manifest error in his action; and, for the reasons herein assigned, the judgment appealed from is affirmed with costs.